**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RICKEY COOPER,                    )
                                  )
            Petitioner,           )        3:97-cv-00222-JCM-WGC
                                  )
vs.                               )        **ORDER**
                                  )
RENEE BAKER, *et al.*,            )
                                  )
            Respondents.          )
_____ /

Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Rickey Cooper, a Nevada prisoner.  ECF No. 51.

I.  FACTUAL AND PROCEDURAL HISTORY

In November 1983, Cooper was convicted, pursuant to jury verdicts, of attempted robbery with the use of a deadly weapon, attempted murder with the use of a deadly weapon, battery with the use of a deadly weapon, and first degree murder with the use of a deadly weapon.  He is currently serving two consecutive life sentences without possibility of parole.

In a March 2006 decision denying post-conviction relief, the Nevada Supreme Court provided the following factual background:

> Shortly after 7:00 p.m. on April 13, 1983, Ricky Williams was shot dead and another person was shot in the hand near the intersection of H Street and Lake Mead Boulevard in Las Vegas.  Williams died from a gunshot wound to his right lung and heart; the bullet entered his back and exited his chest.

Jimmy Ray Thompson testified that he rode his bicycle to the area of H Street and Lake Mead Boulevard on the evening of April 13, 1983.  He encountered and briefly spoke to Williams, who was standing in front of Bruce's Liquor Store.  Thompson pedaled away from the liquor store down H Street when he heard three shots.  He looked and saw Williams running from a car in the parking lot by Bruce's and Highview Market.  He saw four people in the car but could not tell their gender.  He saw a gun barrel drawn back into the front passenger window of the car.  Williams was clutching his chest as he ran.  The car then drove off.

Larry Collier testified that he drove to the area of H Street and Lake Mead Boulevard on April 13, 1983, to buy some "sherm" (a joint of marijuana laced with PCP).  He was accompanied by Debra Manor and two other women.  He parked by Bruce's, got out of the car, and said hello to Williams, who was in front of Bruce's.  He then bought some sherm from an unidentified person.  Another car pulled up and parked by Highview Market.  The front passenger of the car called him over.  He walked to the car and recognized Cooper sitting in the front passenger seat.  There was also a driver in the front and two people in the back seat.  Cooper asked what he was holding, and Collier showed him the sherm.  Cooper told Collier to "give it up."  When Collier refused, Cooper raised a rifle and pointed it toward Collier.  Collier hit it with his hand, the rifle fired, and Collier retreated to the rear of the car and ran.  Williams, who had been just behind him, also ran.  Cooper got up on his knees on the seat and fired two or three more times.  As Collier ran to his car, Williams ran in another direction out of sight.  The car Cooper was in drove away.

Debra Manor testified that she was in Collier's car when the shooting occurred.  She saw Collier walk to the passenger side of another car.  She recognized Shawnette (Ragland) as the driver of the car and Cooper as the front passenger.  She saw one male in the back seat.  Manor saw the end of a gun barrel stick from the passenger window and heard one shot and then two more shots.  Williams was standing near Collier outside the car.  Collier ran to the back of the car, and Williams ran in front of the car and around a store and "laid down."  She testified that she did not know who fired the shots and the only person she saw with a gun was the man in the back seat of the car.  However, the day after the shooting she told police that Cooper fired the shots.  In response to the prosecutor's questions, she admitted that she did not want to testify because she was a little afraid.

She had moved from her former residence after receiving threats to her and her two children, including a rock thrown through her window with a message tied to it.  Defense counsel introduced Manor's preliminary hearing testimony in which she stated that she lied to the police because she was angry at the death of her cousin, Williams.

Sharon Shawnette Ragland testified that she drove to Highview Market on the evening of the shooting.  She was driving her mother's car, and Cooper was in the front passenger seat.  Two other men were in the back seat.  After shopping at the market, she began to drive away when she heard Cooper fire two shots from the car.  She testified that she did not see him with a gun.  Ragland was asked about a statement she made to police the day after the shooting.  Consistently with that statement, she testified that a man selling sherm approached Cooper as he sat in the

2

1   car.  But she denied telling police that Cooper demanded the sherm and pulled a gun,
2   that the man knocked the gun away, and that it went off.  She further denied saying
    that Cooper shot at the man as he ran toward the rear of the car and that Cooper got
3   out of the car and fired twice at Williams, who was just standing there.

4           Donnell Wells testified that he and a friend went to play games at an arcade
    near H Street and Lake Mead Boulevard on the evening of the shooting.  Wells was
5   15 years old.  He knew Williams and talked to him in front of Bruce's.  Later Wells
    and his friend left the arcade and began to walk down the street.  Wells testified that
6   they saw a car driving down H Street, driven by a girl.  He saw Cooper lean across the
    driver and fire two shots from the car.  The car made a U-turn and came back, Cooper
7   fired three more shots, and Williams fell.  Wells testified that he had seen Williams
    and Cooper arguing two or three hours earlier in front of Bruce's and that Cooper said
    that he would be back.
8
            The district court questioned Wells at the end of the testimony.  Among other
9   things, the court asked him if he had ever sworn to tell the truth before in his life, if he
    knew that he was swearing to do so in front of God, and whether he was religious and
10  believed in God.  Wells answered these questions affirmatively.  The court asked him
    if he was sure that the car was moving when the shots were fired and whether
11  testimony by others that the car was parked would be incorrect.  Wells again answered
    affirmatively.
12
13  ECF No. 65-9, p. 4-7.[1]

14          Cooper's direct appeal of his conviction was dismissed by the Nevada Supreme Court on

15  May 15, 1986.

16          On December 8, 1986, Cooper filed his first state post-conviction petition in the Eighth

17  Judicial District Court.  He filed an amended petition on May 22, 1987.  On November 2, 1987, the

18  state district court filed its order denying the petition.  Cooper appealed.  On September 21, 1988, the

19  Nevada Supreme Court filed its order dismissing the appeal.

20          On July 12, 1990, Cooper filed a second state post-conviction petition.  On November 2,

21  1990, the state district court dismissed the petition.  Cooper appealed.  On June 27, 1991, the Nevada

22  Supreme Court dismissed the appeal.

23

24
    _____
25          [1]  References to page numbers in the record are based on CM/ECF pagination.
26
                                        3

On November 16, 1993, Cooper filed his first federal habeas petition in this court, initiating case number CV-N-93-685-DWH.  On February 21, 1995, the petition was denied without prejudice. An amended petition was filed on May 21, 1995.  On February 29, 1996, this court adopted the recommendation of the magistrate judge and dismissed the amended petition without prejudice.

On April 23, 1997, Cooper filed a federal habeas petition in this court that initiated the instant proceeding.  The court appointed the Office of the Federal Public Defender to represent petitioner.  An amended petition was filed on July 15, 1997.  A second amended petition was filed on February 17, 1998.  The magistrate judge filed a report and recommendation, concluding that all claims presented in the second amended petition were unexhausted.  On February 23, 1999, the district judge adopted the recommendation of the magistrate, and the petition was dismissed without prejudice.

On August 21, 1997, Cooper filed a third state post-conviction petition.  The state district court denied the petition.  Cooper appealed.  On July 24, 2000, the Nevada Supreme Court found the petition to be untimely, as it was filed more than 11 years after remittitur issued from the direct appeal.  The court also found the petition was successive.  The court held that the petition was procedurally barred absent a demonstration of cause and prejudice.

The Nevada Supreme Court affirmed the state district court's judgment, except in regard to Cooper's claim that a witness to the murder, Donnell Wells, had recanted his trial testimony and alleged that he had been pressured and paid to testify.  The court concluded that this claim, if true, might provide cause to excuse procedural defaults and entitle petitioner to relief.  As to the remaining contentions, the court concluded that Cooper had failed to demonstrate cause and prejudice to excuse the procedural defaults.

On remand, the state district court conducted an evidentiary hearing.  The state district court denied the petition, finding that it was procedurally barred as untimely and successive.  Cooper again

1   appealed.  On March 2, 2006, the Nevada Supreme Court affirmed the denial of the state habeas

2   petition.  Remittitur issued on May 16, 2006.

3          On May 12, 2006, Cooper filed a motion to re-open this action that was granted on

4   September 27, 2006.  Cooper, through counsel, filed a third amended petition on November 9, 2006.

5   On August 11, 2008, this court granted respondents' motion to dismiss the petition, concluding that

6   all the clams in petition were procedurally barred.  Cooper appealed.

7          On April 1, 2011, the United States Court of Appeals for the Ninth Circuit affirmed, in part,

8   and denied, in part, this court's judgment dismissing the petition.  *Cooper v. Neven*, 641 F.3d 322

9   (9th Cir. 2011).  The case was remanded for further proceedings on Grounds 7A(3), 8(3), 8(5), and

10  Cooper's *Brady*[2] and *Napue*[3] related grounds.  On March 28, 2013, this court entered an order

11  denying respondents' motion to dismiss with respect to the remaining grounds for relief.

12         The respondents have filed an answer to the remaining grounds; and Cooper has filed a reply.

13  Thus, the petition now stands before the court for a decision on the merits.

14  II.  STANDARDS OF REVIEW

15         This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  28

16  U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

17             An application for a writ of habeas corpus on behalf of a person in custody
           pursuant to the judgment of a State court shall not be granted with respect to any

18         claim that was adjudicated on the merits in State court proceedings unless the
           adjudication of the claim –

19
               (1)  resulted in a decision that was contrary to, or involved an unreasonable

20         application of, clearly established Federal law, as determined by the Supreme Court of
           the United States; or

21

22

23         [2]  In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that the
    suppression by the prosecution of evidence favorable to an accused violates due process where the

24  evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor.

25         [3]  In *Napue v. Illinois*, 360 U.S. 264 (1959), the United States Supreme Court held that the
    knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional.

26
                                                    5

1

(2)  resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

2

28 U.S.C. § 2254(d).

3

4      A decision of a state court is "contrary to" clearly established federal law if the state court

5 arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the

6 state court decides a case differently than the Supreme Court has on a set of materially

7 indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable

8 application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

9 Court] to the facts of a prisoner's case." *Id*. at 409.  "[A] federal habeas court may not "issue the

10 writ simply because that court concludes in its independent judgment that the relevant state-court

11 decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

12      The Supreme Court has explained that "[a] federal court's collateral review of a state-court

13 decision must be consistent with the respect due state courts in our federal system." *Miller–El v.

14 Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for

15 evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

16 doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7

17 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination

18 that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

19 on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)

20 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized

21 "that even a strong case for relief does not mean the state court's contrary conclusion was

22 unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v.

23 Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and

24 highly deferential standard for evaluating state-court rulings, which demands that state-court

25 decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

26

6

1      "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

2  adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398.  In *Pinholster*, the Court

3  reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of

4  the state-court decision at the time it was made," and, therefore, the record under review must be

5  "limited to the record in existence at that same time, i.e., the record before the state court." *Id.*

6      For any habeas claim that has not been adjudicated on the merits by the state court, the

7  federal court reviews the claim *de novo* without the deference usually accorded state courts under 28

8  U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

9  F.3d 1160, 1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011)

10  (noting that federal court review is *de novo* where a state court does not reach the merits, but instead

11  denies relief based on a procedural bar later held inadequate to foreclose federal habeas review).  In

12  such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster*, 131 S.Ct at

13  1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas

14  relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct

15  under § 2254(e)(1) even if legal review is *de novo*).

16      Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

17  habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

18  application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so,

19  however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas

20  court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) –

21  whether a state court decision is contrary to, or involved an unreasonable application of, clearly

22  established Federal law." *Id.*

23      III.  STATE COURT ADJUDICATION OF CLAIMS

24      All of the remaining claims in Cooper's petition are premised on, or related to, the testimony

25  of Donnell Wells at trial and/or his subsequent recantation of that testimony.  According to the Ninth

26

1   Circuit, the Nevada Supreme Court adjudicated Cooper's ineffective assistance of counsel claims

2   (Grounds 7A(3), 8(3), and 8(5)) on the merits in Cooper's first state post-conviction proceeding.

3   *Cooper*, 641 F.3d at 331.  The passages from the state supreme court's decision that are relevant to

4   those claims consist of the following.

5           Cooper challenges his trial counsel's performance insisting that the state was
        permitted to vouch for a witness without objection.  The state's comment that the
6       witness had "stuck his neck out" to testify can be appropriately tied to the evidence
        showing that at least one witness had been warned not to testify.  Thus, the state's
7       remark represented an appropriate comment on the evidence; hence, trial counsel's
        performance was not deficient.  *See Strickland* [*v. Washington,* 466 U.S. 668, 687
8       (1984)].

9           . . .

10          Cooper also argues that appellate counsel erroneously failed to argue that the
        district court inappropriately canvassed a witness concerning the witness's religious
11      beliefs.  According to NRS 50.105, the introduction of evidence involving the
        religious beliefs is prohibited if the purpose is to enhance or impair the witness's
12      credibility.  Since the district court's purpose in questioning the witness was to
        ascertain whether the witness understood and appreciated the witness's oath, NRS
13      50.105 is irrelevant.  Accordingly, appellate counsel's failure to raise the issue on
        direct appeal does not represent ineffective assistance of appellate counsel.

14          . . .

15
            According to Cooper, he was denied effective assistance of appellate counsel
16      because such counsel failed to draw this court's attention to prejudicial prosecutorial
        misconduct on direct appeal.  Cooper has failed to specifically identify and
17      persuasively argue the existence of prosecutorial misconduct.  Moreover, no prejudice
        flowing from such alleged misconduct has been shown which would overcome the
18      overwhelming evidence of guilt presented at trial.  Thus, any error would nevertheless
        be harmless.

19

20  ECF No. 57, p. 4-7.

21          According to the Ninth Circuit, the Nevada Supreme Court adjudicated Cooper's *Brady* and

22  *Napue* related grounds (Grounds 1 and 2) on the merits in its March 2006 decision, when it

23  addressed the claims in the context of determining whether Cooper could show cause and prejudice

24  to excuse his procedural default of the claims.  *Cooper*, 641 F.3d at 332-33.  In addition to the

25

26

8

factual background excerpted in Section I. above, the passages from that decision that are relevant to those grounds are as follows:

> At an evidentiary hearing in February 2004 the following evidence was presented. In July 1997 an investigator from the Federal Public Defender's office obtained a declaration signed by Donnell Wells. Wells was incarcerated at Pioche Camp at the time. The declaration stated that detectives pressured him to testify to facts that they told him; that they promised him money to testify; that contrary to his trial testimony, he did not see Cooper shoot the victims; and that after his testimony, the detectives gave him a paper that he redeemed for roughly $100.00.
>
> Cooper called Wells to testify. He testified that he became a trial witness after "detective" (actually investigator) Eddie Shields and another man came to his school – he was in ninth grade – and asked him to answer some questions. They took him from school to the courthouse "once or twice." Wells spoke with them and a third man, but he could not remember whether the third man was prosecutor Mel Harmon. The following direct examination occurred:
>
> Q. Did you tell them at the time that you saw Mr. Cooper shooting?
>
> A. I can't remember.
>
> Q. Did you see Mr. Cooper shooting?
>
> A. To be honest with you, I couldn't really see exactly who was shooting.
>
> Q. So when you testified in court that you saw this gentleman, Rickey Cooper shooting, was that correct?
>
> A. I can't remember.
>
> Q. You can't remember whether you saw him shooting, or you can't remember whether you testified in court that he shot?
>
> A. I can't remember saying that he did the shooting.
>
> Q. If you said he did the shooting, would that have been true?
>
> A. I can't say. I didn't – I can't – I didn't really see his face. I couldn't see him.
>
> Q. So is it your testimony, sir, that you did not see who shot Ricky Williams?
>
> A. Not really. I couldn't really see.
>
> Q. Were you able to describe –

9

A. I couldn't see clearly. I couldn't you know, I just – I thought – I thought it was him.

Q. But you weren't sure?

A. Not – not – now, you know in my, you know, at the age I am right now, I can't really honestly say that that was the man shooting.

Wells described a kind of practice session in the courtroom on the same day of his trial testimony during which the investigators told him what his testimony should be. His account was rather confused. He initially seemed to say that his trial testimony was interrupted and he was taken outside the courtroom and instructed how to testify. He eventually indicated that the interruption and instruction outside the courtroom occurred during a practice on the same day he testified.

Defense counsel asked Wells if the investigators offered him money and he said yes. The following exchange occurred.

Q. So he told you if you said that Rickey Cooper was the shooter he would give you money; is that what you are saying?

A. No. He said—he said, well, if—if you testify—if you say it this way right here, then you can get the money, if not we can't use you.

. . .

Q. Did you initially tell them that this was too dark and you didn't know exactly who the shooter was?

A. Yeah.

Q. And then did he tell you that he believed that Rickey Cooper was the shooter?

A. Well, he didn't say, if I remember, he didn't say that he believed nothing. He just said that Rickey Cooper was the shooter.

Q. So he told you Rickey Cooper was the shooter?

A. Yes.

Q. And he indicated to you that he could only use you and give you this money if you testified what?

A. In the way he—he wanted me to testify.

Q. Which was what? What did he want you to say?

A. That Rickey Cooper was the shooter.

10

Q. And you did say that at trial, did you not?

A. Yeah, I think so.

Q. After you testified at trial did you get any money?

A. Yes, ma'am.

Q. How much money did you get?

A. It was—it was—they gave me two checks.

. . .

Q. Was that a significant amount of money?

A. I think one of them was like 60 bucks. One of them was like 40 bucks, something like that.

Q. So you believe you got a hundred dollars?

A. Close to a hundred dollars.

Q. Okay.  And that was given to you by whom?

A. The detective.

Q. And what if anything did you do with that money?

A. Well, he took me to the mall, and I bought some jeans and some K-Swiss [sneakers].

The two investigators who worked for the District Attorney on this case have died (as have the trial defense counsel and trial witnesses including Ragland).  By stipulation the parties introduced into evidence a voucher showing that Wells was paid $75.00 in witness fees on the day he testified at trial.  The voucher stated "3 days at $25.00."

On cross-examination of Wells the following exchanged occurred:

Q. And how did it happen that Mr. Shields sought you out, if you know?

A. Oh, because I had told Ricky Williams' mom that I was there.

Q. What did you tell Ricky Williams' mom?

A. I told Ricky Williams' mom that I was there when him and Rickey Cooper had a argument, and I was there when the shooting happened.

11

The State called Melvyn Harmon, the sole prosecutor in Cooper's case, to testify.  Harmon denied that he or any of his staff conducted a pretrial practice of Wells's testimony.  He or his investigator would have met with Wells at least three times before the trial.  Harmon testified that his case notes indicated that Wells was scheduled to come to the courthouse at 8:30 a.m. on November 2, 1983, the morning that Harmon gave the opening statement and the day before Wells testified.  Harmon said that his approach was to authorize a fee for each time a witness appeared in the courthouse.  Based on the voucher for Wells, Harmon surmised that "Wells was here in the courthouse speaking either with me or with Mr. Shields or perhaps some other representative of the office of the district attorney at least three times."

The trial record shows that on the morning the trial began, in response to a request for information by defense counsel, Harmon stated in open court that Wells and another person were alleged to be eyewitnesses to the shooting.  He continued, "But there are no formal statements.  I've obtained personal service of them.  I haven't yet spoken personally to them myself."  And two days later, Wells testified that he had first spoken to Harmon earlier that day and had met with someone else from the District Attorney's office earlier in the week.

At the evidentiary hearing, Harmon could not recall when he learned that Wells was a potential witness, but Wells's name was not in Harmon's initial list of witnesses or in his opening statement to the jury.  He moved to endorse Wells's name as a witness on October 10, 1983, three weeks before the trial.  He surmised the he might not have mentioned Wells in his opening statement
because witnesses in the case had been pressured.

Cooper's primary assertion of cause and prejudice is based on the State's alleged violation of *Brady v. Maryland*. [fn. 33: 373 U.S. 83 (1963).]  *Brady* and its progeny require the State to disclose evidence that is favorable and material to the defense. [fn. 34: *Mazzan v. Warden*, 116 Nev. 48, 66, 993 P.2d 25, 36 (2000).]  A *Brady* violation has three components: "the evidence is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." [fn. 35: *Id*. at 67, 993 P.2d at 37.]  The second and third *Brady* components parallel the good cause and prejudice necessary to overcome procedural bars; therefore, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice. [fn. 36: *See id.* at 66-67, 993 P.2d at 36-37.]

The prosecutor's reason for withholding evidence is immaterial, and the prosecutor is charged with constructive knowledge of evidence that other state agents withhold. [fn. 37: *Jiminez v. State*, 112 Nev. 610, 620, 918 P.2d 687, 693 (1996).]  If a defendant made no request or only a general request for information, the evidence is material when a reasonable probability exists that the result would have been different had it been disclosed. [fn. 38: *See Mazzan*, 116 Nev. at 66-67, 993 P.2d at 36-37.]  However, if the request was specific, the evidence is material if there is a reasonable possibility of a different result had there been disclosure. [fn. 39: *See id.*]

Here, Cooper contends that he has shown good cause and prejudice because the State allegedly withheld evidence that Wells told investigators he did not see the

12

shooter and that the investigators nevertheless fed Wells facts and promised him money if his testimony satisfied them.  Before trial began, defense counsel requested the prosecutor to provide "any discovery that he has on [Wells]." [fn. 40: Trial Transcript (November 1, 1983), at 11.]  Because of this specific request, any withheld evidence on Wells is material if there is a reasonable possibility that its disclosure would have led to a different result.

Cooper also contends that Wells's recantation of his trial testimony provides good cause, and he argues that the credibility of the recantation is not relevant to overcoming the procedural bars.  This argument is meritless because it focuses only on cause and ignores the requirement of prejudice.  If the recantation is not credible or otherwise fails to show that Cooper suffered any actual and substantial disadvantage at trial, then he fails to establish the prejudice necessary to overcome the procedural bars.  Although the district court did not expressly find that Wells lacked credibility, it apparently considered his hearing testimony to be largely baseless.  Its order denying Cooper's petition specifically states that Harmon refuted Wells's allegation of a pretrial practice session, which the order deems "farfetched."

Regardless of the sincerity of Wells's hearing testimony, his recantation of his trial testimony was not consistent, clear, or complete, and we conclude that the recantation was not material.  At the evidentiary hearing, Wells testified that he could not clearly see who shot Williams, but "I thought it was him" – that is, Cooper – thought "at the age I am right now, I can't really honestly say that that was the man shooting." [fn. 41: EHT at 15.]  Moreover, at the evidentiary hearing and during an interview at the District Attorney's office in September 2001, Wells has continued to state, as he did in his trial testimony, that he saw an altercation between Cooper and Williams sometime before the shooting. [fn. 42: *Id.* at 23-24; Interview with Donell [sic] Williams 9/21/01, at 2.]  So Wells has not recanted his testimony indicating that Cooper had a motive to shoot Williams.

Wells has, however, alleged that investigators pressured him and promised him money to testify that he saw Cooper shoot Williams even though he told them he did not really see the shooter.  His account of these matters is not very exact or persuasive, however.  In regard to a promise of money, the issue on which the record contains the most evidence to compare with Wells's allegations, it appears that Wells was simply paid witness fees for his trial appearance and pretrial meetings with investigators.  Further, the investigators are dead and cannot give their own accounts of their interactions with Wells.  This fact is prejudicial to the state and reinforces the statutory presumption of prejudice, which Cooper has the burden to rebut.

Of course, a lack of wrongdoing by the investigators does not change the fact that Wells now asserts he did not see who the shooter was.  Even if this assertion is honest, we conclude that even absent Wells's identification of Cooper as the shooter, the jury still would have convicted Cooper.  It is likely the jury gave little weight to Wells's account of the shooting because it is so at odds with the bulk of the evidence that Cooper shot from a parked car.  Although Ragland claimed at trial that she had started to drive when she heard Cooper fire from her car, this testimony was contrary to her statement to police the day after the murder that the car was parked.  And even her testimony differed sharply from Wells's description of two series of shots from a

13

moving car before and after it made a U-turn.  Wells also testified at trial that he saw the second victim get shot in the hand as that victim stood at the door to a fish market, when the victim's own testimony was that he was inside the building about 15 feet from the door when he was shot.

In fact, the discrepancy between Wells's testimony and the other evidence regarding the shooting suggests that the investigators did not coach that testimony. The questionable nature of Wells's testimony regarding the shooting was obvious.  It prompted the district court to ask him if he understood that he had sworn to tell the truth in front of God and if he was sure the car was moving when the shots were fired. Cooper contends, however, that the prosecutor and the district court improperly bolstered Wells's testimony, increasing its significance.  In making this contention, Cooper completely mischaracterizes the district court's questioning of Wells. Anyway, this court considered and rejected similar claims raised by Cooper in his first postconviction petition.  Our earlier decision is the law of the case and cannot be avoided by more detailed and precisely focused argument. [fn. 45: *See Hall v. State*, 91 Nev. 314, 315-16, 535 P.2d 797, 798-00 (1975).]

To sum up, we conclude that substantial evidence supports finding that the investigators did not act improperly and therefore that the State did not withhold evidence in violation of *Brady*.  Further, even if Wells falsely testified at trial that he clearly saw Cooper shoot Williams, Cooper still fails to overcome the procedural bars to raise this claim.  He demonstrates cause for not raising the claim earlier since Wells's recantation revealed an impediment external to the defense and was not available until Wells spoke up.  However, he does not demonstrate prejudice since Wells's description of the shooting at trial was not particularly convincing to begin with, while the other evidence of Cooper's guilt was strong. [fn. 46: *Cf. Callier v. Warden*, 111 Nev. 976, 901 P.2d 619, 627-28 (1995) (stating that recanted false testimony requires relief only if a different trial outcome is probable had the testimony not been admitted).]  Moreover, Cooper has not rebutted the presumption that his late claim has prejudiced the State.  Consequently, the district court did not err in denying Cooper's petition.

ECF No. 65-9, p. 8-19 (footnotes citing to state court record omitted).

IV.  ANALYSIS OF CLAIMS

**Ground 1**

In Ground 1, Cooper contends that his conviction is in violation of his constitutional rights because it is based on the false testimony of Donnell Wells.  In July of 1997, Wells, then an inmate at Pioche Prison Camp, provided an investigator with the federal public defender's office a declaration stating that he did not see Cooper shoot the victims, that detectives pressured him to testify, and that he was compensated "roughly $100" for his testimony.  ECF No. 62-4, p. 21.  As

14

1   recounted above, Wells testified at the state court evidentiary hearing in February 2004 about the

2   circumstances surrounding his testimony at trial and his subsequent recantation.

3        Cooper makes no allegation under Ground 1 that the state withheld evidence favorable to the

4   defense or that it knowingly fostered the presentation of false testimony.  As such, it is does not

5   present a prima facie case for relief under either *Brady* or *Napue*.  Thus, despite Cooper's efforts to

6   transform it into a *Napue* claim in his reply, Ground 1 is premised entirely on the theory that

7   Cooper's conviction is in violation of his right to due process and a fair trial because it was based on

8   Wells's false testimony.

9        As respondents point out, the mere recantation of testimony does not provide grounds for

10  habeas relief.  *Hysler v. Florida*, 315 U.S. 411, 413 (1942*); Carothers v. Rhay*, 594 F.2d 225, 229

11  (9th Cir. 1979).  "The essence of the due process violation is misconduct by the government, not

12  merely perjury by a witness."  *Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).

13  Theoretically, the revelation that a defendant was convicted based on false testimony might provide

14  grounds for habeas relief based on actual innocence.  *See McQuggin v. Perkins*, 133 S.Ct. 1924,

15  1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a

16  freestanding claim of actual innocence.").  However, even in a capital case (which this is not), a

17  freestanding actual innocence claim might warrant federal habeas relief only upon an

18  "extraordinarily high" and "truly persuasive" threshold showing.  *Herrera v. Collins*, 506 U.S. 390,

19  417 (1993).

20       Here, the Nevada Supreme Court addressed two separate, but related, cause-and-prejudice

21  arguments – one based on a *Brady* claim that the state withheld evidence related to Wells's

22  testimony and the other based on Wells's recantation, in and of itself.  ECF No. 65-9, p. 15-16.  As

23  to the latter, the Nevada Supreme Court found that Wells's recantation was "not consistent, clear, or

24  complete" and that he did not recant an important aspect of his testimony, i.e., that he "saw an

25  altercation between Cooper and Williams some time before the shooting," which indicated that

26

15

1   "Cooper had a motive to shoot Williams." *Id*., p. 16.  The court then further concluded that, even if

2   Wells's belated claim about not seeing the shooter was accurate, the jury would have still convicted

3   Cooper without Wells's identification because Wells's account of the shooting at trial conflicted

4   with the "bulk of the evidence" anyway and there was ample other evidence that Cooper was the

5   shooter.  *Id*., p. 16.

6          Thus, Nevada Supreme Court concluded that Wells's allegedly false testimony was harmless

7   under a standard far less stringent than that which would apply to a freestanding actual innocence

8   claim.  That determination alone precludes relief, separate and apart from whether false testimony (in

9   the absence of State wrongdoing) can provide grounds for habeas relief.  *Mitchell v. Esparza*, 540

10   U.S. 12, 17-18 (2003) (holding that federal court must defer to state court harmless error analysis

11   unless it was in "conflict with the reasoning or the holdings of [Supreme Court] precedent" or if it

12   "applied harmless-error review in an 'objectively unreasonable' manner").

13          Ground 1 is denied.

14                              **Ground 2**

15          In Ground 2, Cooper alleges that the state failed to produce material exculpatory and

16   impeachment evidence related to Wells's testimony – i.e., that he was promised money in exchange

17   for testimony that was coached by a district attorney investigator.  Cooper argues that he has shown

18   that Wells could not identify him as the shooter, but there "was an agreement between the district

19   attorney investigator and Wells," which, as Wells understood it, provided that "he would testify that

20   Cooper was shooter and then he would receive money."  ECF No. 147, p. 55.  Cooper contends that

21   uncontradicted facts support a claim for habeas relief under *Brady* and *Napue*.

22          The evidence supporting this claim is described in the above excerpt from the 2006 Nevada

23   Supreme Court decision.  As noted, the Ninth Circuit determined that the Nevada Supreme Court's

24   cause-and-prejudice analysis of Cooper's *Brady* claim was, in essence, a decision on the merits of

25

26

1    the claim itself.  *Cooper*, 641 F.3d at 332-33.  Accordingly, Cooper would be entitled to relief on the

2    claim only if the state court's decision is not worthy of deference under § 2254(d).

3           The Nevada Supreme Court concluded "that substantial evidence supports a finding that the

4    investigators did not act improperly and therefore that the state did not withhold evidence in

5    violation of *Brady*."  ECF No. 65-9, p. 18.  In support of this finding, the court noted that Wells's

6    account of the investigators pressuring him and promising him money in exchange for fabricated

7    testimony was unconvincing and that "it appears that Wells was simply paid witness fees for his trial

8    appearance and pretrial meetings with investigators."  *Id*, p. 16-17.  Having reviewed the record

9    herein, this court agrees.

10          Wells's testimony at the 2004 evidentiary hearing was confused, ambiguous, and internally

11   inconsistent.  As just one example and as mentioned by the Nevada Supreme Court, Wells initially

12   testified that it was *during his testimony at trial* that the illicit pressuring occurred – more

13   specifically, Wells implausibly claimed that proceedings were halted as he was testifying from a

14   diagram at trial, whereupon the "detectives" took him out into the hallway to coach him before he

15   resumed his testimony.  ECF No. 62-5, pp. 16-17, 25-29, 31-32.  After the deputy district attorney

16   asked him to pinpoint in the trial transcript where that occurred and defense counsel asked him some

17   leading questions, Wells modified his account to indicate that it was during a practice session that

18   this occurred.[4]  *Id*., p. 35-36.

19          This court also assigns little weight to Wells's 1997 declaration, which is notably lacking in

20   specific details about the events surrounding the purported coaching of his trial testimony.[5]  The

21

22          [4]  That account prompts a question as to why it would be necessary for the investigators to take
     Wells out of the courtroom and into the hallway if it was merely a rehearsal of his testimony.

23
            [5]  In this regard, this court notes that, in the declaration, Wells recalls using the money to buy "K-
24   Swiss shoes and Levi's brand jeans" at the "Meadows Mall," but the remaining subject matter in the
     declaration is described with far less specificity.  ECF No. 62-4, p. 21.  The fact that Wells received
25   money for testifying is not in dispute (only whether the money was a legitimate witness fee or
     compensation for fabricating testimony).  Thus, it is entirely conceivable that Wells did, in fact, use the

26

1   September 2001 interview conducted by the district attorney investigator is also suspect in that,

2   similar to his initial testimony at the evidentiary hearing, Wells told the investigator that the

3   coaching occurred in the middle of his direct examination at Cooper's trial.  ECF No. 62-4, p. 70-72.

4   And, despite Cooper's argument to the contrary, Wells's refusal to capitulate to the investigator's

5   attempt to convince him that the money he received was merely a legitimate witness fee does not

6   necessarily lend credibility to Wells's version of events.

7          The Nevada Supreme Court's determination that the state did not improperly withhold

8   evidence in violation of *Brady* (or, by implication, knowingly present false testimony in violation of

9   *Napue*) is objectively reasonable and, therefore, entitled to deference under § 2254(d).  Moreover, for

10  the reasons above, this court reaches the same conclusion based on its *de novo* review of the record.

11  Even if Wells's testimony at trial was inaccurate, there is no *Brady* or *Napue* violation if the state did

12  not withhold exculpatory evidence or have reason to know that Wells was providing false testimony.

13         Cooper argues that the Nevada Supreme Court determined that he had made a showing of

14  good cause with respect to his *Brady* claim and, in so doing, concluded that he had satisfied the first

15  two elements of his *Brady* claim.  This argument is based, however, on a misreading of the Nevada

16  Supreme Court's opinion.  In the briefs he filed with the Nevada Supreme Court, Cooper advanced

17  two distinct grounds for finding good cause and prejudice to excuse his defaults: 1) the state's

18  suppression of "*Brady/Giglio/Napue*" information[6] and 2) the "newly discovered evidence of

19  Wells's recantation."  ECF No. 65-2, p. 15-33; ECF No. 65-4, p. 11-35.  While its analysis of the

20  two grounds overlaps, the Nevada Supreme Court addressed each ground separately in its decision.

21  ECF No. 65-9, p. 15-16.  As noted, the court explicitly concluded that "the State did not withhold

22

23  money to purchase those specific items at that particular location, which would explain his ability to
    recall that particular event in such detail.

24      [6] *Giglio* refers to *Giglio v. United States*, 405 U.S. 150 (1972), which held that nondisclosure

25  of impeachment evidence falls within the *Brady* rule.

26

1   evidence in violation of *Brady*." *Id.*, p. 18.   The court's conclusion that Cooper had shown good

2   cause was based entirely on the fact that "Wells's recantation revealed an impediment external to the

3   defense and was not available until Wells spoke up." *Id.*[7]

4          Because it concluded that the state did not improperly withhold evidence in the first place,

5   the Nevada Supreme Court did not specifically address whether the non-disclosed evidence was

6   material.  Instead, the court's prejudice analysis focused primarily on the ground for which it found

7   good cause – i.e., Wells's recantation.  In that regard, the court found insufficient prejudice because

8   the recantation was "not consistent, clear, or complete" and Wells did not recant an important aspect

9   of his testimony, i.e., that he "saw an altercation between Cooper and Williams some time before the

10  shooting," which indicated that "Cooper had a motive to shoot Williams." ECF No. 65-9, p. 16.

11  The court then further concluded that, even if Wells's belated claim about not seeing the shooter was

12  accurate, the jury would have still convicted Cooper without Wells's identification because Wells's

13  account of the shooting at trial conflicted with the "bulk of the evidence" anyway and there was

14  ample other evidence that Cooper was the shooter. *Id.*, p. 17.

15         In light of the foregoing, Cooper misses the mark with his arguments claiming that the

16  Nevada Supreme Court did not apply the correct materiality standards under *Brady* and *Napue*.  The

17  Nevada Supreme Court correctly noted that the materiality inquiry under *Brady* asks whether "a

18  reasonable probability exists that the result would have been different" had the evidence been

19  disclosed. *Id.*, p. 15.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing the same

20  standard).  And, while the Nevada Supreme Court was ostensibly applying only *Brady*, not *Napue*,

21  the court held that, for state law reasons, a relaxed materiality standard applied to Cooper's claim.

22

23         [7]  This court is aware that the Ninth Circuit in *Cooper* stated: "The [Nevada Supreme] Court
    found that Cooper had demonstrated cause for not raising the *Brady* violation and witness recantation
24  claims earlier, but that he had failed to demonstrate prejudice." *Cooper*, 641 F.3d at 326.  However, that
    statement is merely part of the court's recitation of factual and procedural background.  And, whether
25  or not the Nevada Supreme Court found cause based on Cooper's *Brady* claim was not germane to the
    holding in *Cooper*.

26

1    That is, the Nevada Supreme Court cited the relevant inquiry as whether "there is a reasonable

2    *possibility* of a different result had there been disclosure," which is essentially the same as, and

3    certainly no stricter than, the standard applied in cases of *Napue* error.  *Id.*, p. 15 (emphasis added).

4    *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (noting that a *Napue* violation is material when

5    there is "any reasonable likelihood that the false testimony could have affected the judgment of the

6    jury).  As such, it would not have been "contrary to" clearly established Supreme Court law for the

7    purposes § 2254(d)(1) if the Nevada Supreme Court applied this standard.  *See Early v. Packer*, 537

8    U.S. 3, 8 (2002) (per curiam) (holding that state court is not required to cite Supreme Court cases, or

9    even be aware of them, to avoid its decision being "contrary to" Supreme Court precedent).  As

10   explained, however, the Nevada Supreme Court concluded that Cooper had not shown that the state

11   improperly withheld evidence to begin with, so neither materiality standard was satisfied.

12          Cooper also argues that the Nevada Supreme Court "misapprehended Wells's testimony with

13   respect to his recantation and has overlooked and minimized the impact that Wells's testimony had

14   on the jury."  ECF No. 147, p. 66.  As to the former, Cooper contends that Wells's recantation

15   "satisfied the criteria of reliability."  *Id.*, p. 68.  For the reasons set forth above, however, this court

16   agrees with the Nevada Supreme Court's characterization of Wells's recantation as being "not

17   consistent, clear, or complete."

18          The Nevada Supreme Court's assessment of the impact of Wells's trial testimony is also

19   objectively reasonable.  Cooper is correct that the police statements, preliminary hearing testimony,

20   and trial testimony of various witnesses to the shooting are rife with inconsistencies.  However, as to

21   the focal point of Wells's recantation (i.e., his identification of Cooper as the shooter), all of those

22   sources taken together lead to the inescapable conclusion that Cooper fired the shots that killed

23   Williams and injured Norman.  Thus, Wells's testimony on that point added very little to the State's

24   case against Cooper.  As for witnessing an altercation between Cooper and Williams prior to the

25   shooting, there is no evidence that Wells recanted that aspect of his testimony and, in fact, he

26

20

confirmed it during his September 2001 interview with the district attorney investigator and in his testimony at the 2004 evidentiary hearing.  ECF No. 62-4, p. 67; ECF No. 62-5 100, pp. 15, 25. And, the record before this court contains no discernible reason for Wells to have fabricated that portion of his testimony.

Lastly, Cooper argues that, irrespective of whether the money paid to Wells was a legitimate witness fee, the Nevada Supreme Court "disregarded the uncontradicted evidence that Wells believed that he was being offered 'money' in exchange for his testimony against Cooper."  ECF No. 147, p, 72.  According to Cooper, the Nevada Supreme Court's failure to conclude that this "undisclosed financial reward for [Wells's] testimony" was *Brady* material constituted an unreasonable application of Supreme Court precedent and an unreasonable determination of the facts. *Id.*, p. 75.

This argument is untenable to the extent that it suggests that the prosecutor was obligated to disclose to the defense Wells's *perception* of the payment he was to receive for his testimony. Cooper has not shown that the manner or amount that Wells was paid differed appreciably from the way other witnesses were compensated.   NRS § 50.225 provides that each witness "attending the courts of this State in any criminal case, . . . in obedience to a subpoena, . . .  is entitled . . . [t]o be paid a fee of $25 for each day's attendance."  Moreover, Cooper concedes that the district attorney in this case had a "long-standing practice of witness fee payments for pretrial conferences."  ECF No. 147, p. 74.  Accordingly, the Nevada Supreme Court's conclusion that payment of the fee was not *Brady* material was not unreasonable.  *See United States v. Wicker*, 933 F.2d 284, 293 (5th Cir. 1991) (holding that government's failure to disclose witness fees did not constitute a *Brady* violation where the procedure for paying of witness fees was public information and defense made no specific request for witness fee information).

For the foregoing reasons, Ground 2 does not entitle Cooper to habeas relief.

**Ground 7A(3)**

1    In Ground 7A(3), Cooper alleges that he received ineffective assistance of counsel, in

2    violation of his constitutional rights, because his trial counsel failed to object to prosecutorial

3    misconduct, specifically, improper vouching and commentary regarding Wells's credibility.[8]  In

4    support of this claim, Cooper contends that Wells provided the only testimony that suggested a

5    motive for Cooper to shoot Williams, that being testimony that Wells saw them involved in an

6    argument a few hours prior to the shooting.  According to Cooper, the prosecutor improperly

7    vouched for Wells's testimony by making the following comments in his closing argument:

8         I happen to be a believer in heroes and there is a hero in this case.  Nobody did what
          Mr. Wolf said and sent him down here.  There's a little 15-year-old guy who was
9         subpoenaed.  He got a subpoena that said you had to come to court and he came down
          here and stuck his neck out.

10

11   ECF No. 53-11, p. 40.

12       In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

13   prong test for analysis of claims of ineffective assistance of counsel: a petitioner claiming ineffective

14   assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an

15   objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced

16   the defendant such that "there is a reasonable probability that, but for counsel's unprofessional

17   errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688, 694.

18       As indicated in the excerpt above from its decision in Cooper's first post-conviction

19   proceeding, the Nevada Supreme Court concluded that the remark at issue was an appropriate

20   comment on the evidence (i.e., "evidence showing that at least one witness had been warned not to

21   testify") and, as such, counsel did no perform ineffectively in failing to object.  Cooper argues that

22   the Nevada Supreme Court unreasonably applied the *Strickland* standard by not finding that the

23

24       [8]  On January 16, 2014, Cooper filed a declaration abandoning an allegation, under Ground
25   7A(3), that counsel was ineffective in failing to object to the prosecutor's "improper injection of race
     into the proceedings."  ECF No. 149.

26

1    comments went beyond the bounds of proper comment and constituted improper vouching.  He

2    further argues that the Nevada Supreme Court's failure to hold an evidentiary hearing resulted in a

3    the court improperly "supply[ing] a tactical reason for an attorney's actions in order to deny an

4    ineffective assistance of counsel claim."  ECF No. 147, p. 83.

5         These arguments notwithstanding, the Nevada Supreme Court's decision is nonetheless

6    entitled to deference under § 2254(d).  Vouching occurs when the prosecution places the prestige of

7    the government behind a witness through personal assurances of the witness's veracity or suggests

8    that information not presented to the jury supports the witness's testimony.  *United States v.*

9    *Weatherspoon*, 410 F.3d 1142, 1147 (9th Cir. 2005); *United States v. Necoechea*, 986 F.2d 1273,

10   1276 (9th Cir. 1993).  Vouching is "especially problematic in cases where the credibility of the

11   witnesses is crucial."  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991).  However,

12   "prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue

13   reasonable inferences based on the evidence . . . ."  *Necoechea*, 986 F.2d at 1276.

14        Here, whether or not the comments at issue constituted improper vouching is subject to

15   reasonable debate.  On the one hand, the focus of the comments was Wells's courage, not his

16   veracity.  And, as the Nevada Supreme Court noted, the assertion that it took courage for Wells to

17   testify was a reasonable inference that could be drawn from evidence that at least one person had

18   been warned not to testify.  On the other hand, by referring to Wells as a "hero," the prosecutor was

19   implicitly suggesting that he must be telling the truth.  And, the prosecutor's claim that "[n]obody . .

20   . sent him down here" is arguably a reference to extrinsic information that supported Wells's

21   testimony.

22         "Because many lawyers refrain from objecting during opening statement and closing

23   argument, absent egregious misstatements, the failure to object during closing argument and opening

24   statement is within the 'wide range' of permissible professional legal conduct."  *Necoechea*, 986

25   F.2d at 1281 (citing *Strickland*, 466 U.S. at 689).  And, even if Cooper's counsel did not consciously

26

                                          23

1   withhold an objection as a matter of strategy, the egregiousness of the comment must be taken into

2   consideration in determining whether his failure to object fell below constitutional standards.  *See*

3   *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (pointing that even inadvertent omissions are not

4   necessarily grounds for relief because "[t]he Sixth Amendment guarantees reasonable competence,

5   not perfect advocacy judged with the benefit of hindsight").  Viewed in terms most favorable to

6   Cooper, the prosecutor's comments about Wells's testimony only marginally exceeded the bounds of

7   proper comment and constituted, at most, a borderline case of improper vouching.  As such, the

8   Nevada Supreme Court's rejection of Cooper's ineffective assistance of counsel claim was not

9   objectively unreasonable.[9]

10   Ground 7A(3) is denied.

11   **Ground 8(3)**

12   In Ground 8(3), Cooper alleges that he received ineffective assistance of appellate counsel, in

13   violation of his constitutional rights, because his appellate counsel failed to raise an issue premised

14   on the prosecutorial vouching discussed above.  The Nevada Supreme Court denied this claim,

15   concluding that Cooper had "failed to specifically identify and persuasively argue the existence of

16   prosecutorial misconduct."  ECF No. 57, p. 7.  The court also concluded that "no prejudice flowing

17   from such alleged misconduct has been shown which would overcome the overwhelming evidence

18   of guilt presented at trial," so "any error would nevertheless be harmless."  *Id.*

19   To obtain habeas relief based on a prosecutor's remarks, a petitioner must demonstrate that

20   the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due

21

22        [9]  With respect of his argument premised on the state court's failure to hold an evidentiary

23   hearing, Cooper concedes that his state post-conviction counsel advised the state court, in response to
     the court's inquiry as to the need for an evidentiary hearing, that he "did not know what additional

24   evidence would come in by way of testimony."  ECF No. 56-3, p. 4.  Also, because the state court's
     rejection of Cooper's IAC claim was reasonable irrespective of the rationale (or lack thereof) behind

25   counsel's failure to object, the state court did not err by failing to hold an evidentiary hearing on the
     issue.

26

1   process." *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir.2004) (quoting *Darden v. Wainwright*, 477

2   U.S. 168, 181 (1986)).  In addition, "a criminal conviction is not to be lightly overturned on the basis

3   of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context;

4   only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the

5   trial." *United States v. Young*, 470 U.S. 1, 11 (1985).  The Nevada Supreme Court uses the same

6   standards in considering whether prosecutorial misconduct warrants reversal on direct appeal. *Evans*

7   *v. State*, 926 P.2d 265, 286 (Nev. 1996).  Accordingly, comments that are harmless beyond a

8   reasonable doubt do not warrant reversal. *Witherow v. State*, 765 P.2d 1153, 1155 (Nev. 1988).

9        For reasons discussed above in relation to Ground 7A(3), the comments fell well short of

10   rendering the trial so unfair that it deprived Cooper of due process.  In fact, it is arguable that they

11   did not impose any unfairness at all.  In addition, the reviewing court must consider whether

12   improper argument was mitigated by jury instructions. *See United States v. Lopez-Alvarez*, 970 F.2d

13   583, 597-98 (9th Cir. 1992) (dismissing prosecutorial misconduct charge because the jury was

14   instructed that "the lawyers' statements are not evidence," and this was sufficient to neutralize any

15   prejudice).  At Cooper's trial, the court issued several instructions informing the jury that guilt or

16   innocence was to be determined by the evidence presented, not argument.  ECF No. 54 (Jury

17   Instruction Nos. 1, 27, 28, and 35).

18        When considered in context, the prosecutor's comments were sufficiently harmless that the

19   appellate counsel's failure to raise them as an issue on appeal did not amount to ineffective

20   assistance of counsel.  Alternatively, there is not a reasonable probability that the outcome of

21   Cooper's direct appeal would have been more favorable if appellate counsel had raised the issue.

22   Thus, Cooper is not entitled to relief based on Ground 8(3).

23   \ \ \

24        **Ground 8(5)**

25

26

25

In Ground 8(5), Cooper alleges that he received ineffective assistance of appellate counsel, in violation of his constitutional rights, because his appellate counsel failed to raise an issue premised on the trial court's improper questioning and attempts to rehabilitate Wells.  At the conclusion of Wells's testimony at trial, the trial court asked Wells: "Are you a religious young man?" and "Do you believe in God?"  ECF No. 53-9, p. 3.  The trial court then inquired whether Wells's failure to come forward earlier was because he was afraid.  *Id*.  Then, the following colloquy occurred:.

> COURT:  If I were to tell you that others have been in this court and testified that the car was parked when the shots were fired, would you think that incorrect?
>
> WELLS:  Well, from what I saw, the car was moving.
>
> COURT:  I see.  But would you think that anyone else who might have testified that the car was parked and stopped, would you think they were in error?
>
> WELLS: Yes.
>
> COURT:  I see.  And you did say that it was a young girl driving that car?
>
> WELLS: Yes.
>
> COURT:  And you thought it to be a Ford?
>
> WELLS: Yes.
>
> COURT:  And it was, from the way you told it, I took it to mean that it's two-tone?
>
> WELLS: Uh-huh.
>
> COURT:  Which was the color from the bottom?
>
> WELLS: It was a light, light red.
>
> COURT:  Light red on the bottom?
>
> WELLS: Yes, Orange or – orange.
>
> COURT:  May we have those exhibits, please.
>
> PROSECUTOR:  Certainly, your Honor.
>
> COURT:  I would show you now –
>
> DEFENSE COUNSEL:  Your, Honor, may we approach the bench, please?

1    COURT:  Yes.

2  *Id.*, p. 4-5.

3    After the side bar, the trial court asked Wells a series of questions regarding the identification

4  of the vehicle involved in the shooting.  *Id.*  The trial court then pointed out that it had conducted its

5  inquiry of Wells pursuant to NRS 50.145, after which, defense counsel noted his "objection for the

6  record."  *Id.*

7    In his first state post-conviction proceeding, Cooper argued that appellate counsel was

8  ineffective because counsel did not argue that the trial court's inquiry into Wells's religious belief

9  was "highly improper" and that the trial court "bolstered the State's case with the testimony from this

10  witness."  ECF No. 56-8, p. 33-34.  The Nevada Supreme Court concluded that NRS 50.105,[10] the

11  statute Cooper cited in his brief, did not apply because "the district court's purpose in questioning the

12  witness was to ascertain whether the witness understood and appreciated the witness's oath."  ECF

13  No. 57, p. 6.  Accordingly, the state supreme court concluded appellate counsel's failure to raise the

14  issue on direct appeal did not amount to ineffective assistance of appellate counsel.  *Id.*

15    Respondents argue that Cooper is not entitled to habeas relief because no United States

16  Supreme Court case has ever held that a judge is not permitted to question a witness in the manner

17  that the trial court questioned Wells.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) (concluding

18  that, because of the lack Supreme Court holdings supporting the petitioner's claim, "it cannot be said

19  that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'").  As Cooper points

20  out, however, Ground 8(5) is an ineffective assistance of appellate counsel claim, not a substantive

21  judicial interference claim.

22

23

---

24    [10]  NRS 50.105 provides: Evidence of the beliefs or opinions of a witness on matters of religion
   is inadmissible for the purpose of showing that by reason of their nature the witness's credibility is

25  impaired or enhanced.

26

1    Even so, Cooper does not cite any controlling authority on point that shows that an appellate

2  argument based on the trial court's questioning of Wells had a reasonable chance of prevailing on

3  direct appeal in the Nevada Supreme Court.[11]  In *Duckett v. Godinez*, 67 F.3d 734, 739 (9th Cir.

4  1995), the Ninth Circuit considered a case in which the trial judge "intervened in the examination of

5  prosecution witnesses, sometimes interjecting specific questions and other times taking over the

6  questioning altogether, and, "[i]n several of these instances, the judge elicited testimony which was

7  helpful to the prosecution and detrimental to the defense." *Duckett*, 67 F.3d at 739.

8    Though the court was conducting habeas review, it noted that on direct appeal "'the standard

9  for reversing a verdict because of general judicial misconduct during trial is rather stringent'" and

10  that, "[t]o sustain a claim of this kind, there must be an 'extremely high level of interference' by the

11  trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Id*. at 740 (quoted

12  citations omitted).  The trial court's questioning of Wells in this case does not approximate the type

13  of misconduct that would provide grounds for reversal.  Thus, Cooper's appellate counsel was not

14  ineffective in failing to raise a judicial misconduct claim.

15    Ground 8(5) is denied.

16    V.  CONCLUSION

17    For the reasons set forth above, Cooper's petition for habeas relief is denied.

18    *Certificate of Appealability*

19    This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing

20  Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

21  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the

22

23

24    [11] The only Nevada case involving a criminal appeal that Cooper cites is *Kinna v. State*, 447 P.2d
    32 (Nev. 1968).   In that case, the court concluded that "colloquies between the trial judge and the
25  Deputy Public Defender regarding counsel's attempt to cross-examine and to impeach the state's
    witnesses" were insufficient grounds for reversal.  447 P.2d at 35-36.

26

1   issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.
2   2002).

3          Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a
4   substantial showing of the denial of a constitutional right."  With respect to claims rejected on the
5   merits, a petitioner "must demonstrate that reasonable jurists would find the district court's
6   assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484
7   (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA
8   will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the
9   denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

10          The COA standard is not high.  Cooper must only "'sho[w] that reasonable jurists could
11   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to
12   proceed further.'"  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations
13   omitted).  Having reviewed its determinations and rulings in adjudicating Cooper's petition, the
14   court declines to issue a certificate of appealability for its resolution of any procedural issues or any
15   of Cooper's habeas claims.

16          **IT IS THEREFORE ORDERED** that petitioner's amended petition for writ of habeas
17   corpus (ECF No. 51) is DENIED.  The clerk shall enter judgment accordingly.

18          **IT IS FURTHER ORDERED** that a certificate of appealability is DENIED.
19          Dated March 17, 2015.

21          _____
            UNITED STATES DISTRICT JUDGE

29